**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**

**UNITED STATES OF AMERICA,**

v.                                                        **Criminal Action No. 2:24-CR-04
(KLEEH)**

**NITESH RATNAKAR,**

                Defendant.

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR NEW TRIAL**

Now comes the United States of America and Randolph J. Bernard, Acting United States Attorney for the Northern District of West Virginia, by Eleanor F. Hurney and Jarod J. Douglas, Assistant United States Attorneys for said District, and files this response in opposition to Defendant's Motion for New Trial [ECF No. 115], filed on December 22, 2024.

## I. Procedural Background

On February 21, 2024, a grand jury sitting in Elkins, West Virginia, returned a 43-count Indictment against the defendant. The Indictment charged the defendant with 38 counts of Willful Failure to Pay Over Tax (Counts 1-38), in violation of 26 U.S.C. § 7202, alleging that the defendant willfully failed to pay over withheld payroll taxes for quarters in the period of 2018 through 2022, relating to employees of his medical practice, West Virginia Gastroenterology and Endoscopy ("WVGE"), and employees of his medical equipment manufacturing company, Saneso, Inc. ("SANESO").

The Indictment charged the defendant with three counts of Filing a False Income Tax (Counts 39-41), in violation of 26 U.S.C. § 7206(1), alleging that the defendant willfully made and subscribed individual income tax returns for tax years 2020, 2021, and 2022, in which he

1

fraudulently inflated his tax refund by falsely claiming Form W-2 withholdings from WVGE in amounts higher than the tax deposits WVGE made.

The Indictment charged the defendant with one count of Obstruction of Justice (Count 42), in violation of 18 U.S.C. § 1512(c)(2), alleging that the defendant caused his return preparer to sign and backdate several Forms 941 that he then caused to be provided to the U.S. Attorney's Office for the Northern District of West Virginia as returns on subpoenas issued to WVGE and SANESO.

From November 12, 2024, to November 19, 2024, this Court held a jury trial on the Indictment. On November 18, 2024, after the close of the government's case-in-chief, the defendant orally moved for a judgment of acquittal on all counts. [Doc. 103 at 116]. After hearing argument from counsel and finding sufficient evidence on each count, viewing the evidence in the light most favorable to the government, the Court denied the motion. *Id.* at 116–28.

On November 19, 2024, the jury returned a verdict of guilty on all tax counts and not guilty on the obstruction count [Doc. 94]. On December 22, 2024, the defendant filed the instant Motion for New Trial [Doc. 115].

## II. Legal Standard

Rule 33(a) of the Federal Rules of Criminal Procedure provides that a district court may vacate a criminal conviction and "grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "In deciding a motion for a new trial, the district court is not contained by the requirement that it view the evidence in the light most favorable to the government and may evaluate the credibility of the witnesses." *United States v. Miller*, 41 F.4th 302, 315 (4th Cir. 2022) (internal quotation marks omitted). In so deciding, the district court may draw on its knowledge and observations of the trial as the presiding judge. *See United States v. Johnson*, 487 F.2d 1278 (4th Cir. 1973) (district court did not err in drawing on its recollection, as the presiding trial judge,

of the suspicious circumstances surrounding post-trial recantation of a trial witness's testimony). A new trial is warranted only if such relief would prevent a miscarriage of justice. *See, e.g.*, *United States v. Magallon*, 984 F.3d 1263, 1286 (8th Cir. 2021) (motions for new trial "should only be granted when 'a miscarriage of justice' may have occurred."); *United States v. Gramins*, 939 F.3d 429, 444 (2d Cir. 2019); *United States v. Laureano-Salgado*, 933 F.3d 20, 29 (1st Cir. 2019) ("the new-trial remedy 'must be used sparingly, and only where a miscarriage of justice would otherwise result.'"); *United States v. Chapman*, 851 F.3d 363, 380–81 (5th Cir. 2017); *United States v. Arrington*, 757 F.2d 1484 (4th Cir. 1985) (new trial is warranted only "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment.").

The defendant bears the weighty burden of establishing that relief under Rule 33 is warranted. *See United States ex rel. Darcy v. Handy*, 351 U.S. 454 (1956); *see also United States v. Bowen*, 799 F.3d 336 (5th Cir. 2015); *United States v. Colon-Munoz*, 318 F.3d 348 (1st Cir. 2003); *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982).

### III. Argument

Dr. Ratnakar raises three theories which he argues entitle him to a new trial. Each theory, which will be addressed in turn, is unavailing.

#### A. Assuming a closure of the courtroom occurred, it was too trivial to constitute a violation of Dr. Ratnakar's Sixth Amendment right.

Dr. Ratnakar has submitted affidavits from his wife and daughter, himself, and his counsel, establishing that (1) his family members were not permitted to observe jury selection, and (2) neither he nor his counsel were aware of this until after trial. Accepting the facts as set forth in the affidavit as accurate, the Government respectfully submits that the described closure – of which neither the parties nor the Court was aware – was too trivial to constitute a Sixth Amendment violation. *See Snyder v. Coiner*, 510 F.2d 224, 230 (4th Cir. 1975).

1.

The Sixth Amendment guarantees all criminal defendants "the right to a speedy and public trial," *Waller v. Georgia*, 467 U.S. 39, 46 (1984), including during the trial's jury selection stage. *Presley v. Georgia*, 558 U.S. 209, 213 (2010). An "open trial . . . plays an important role in the administration of justice" and "[t]he value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed." *Press-Enter. Co. v. Superior Court of Cal., Riverside Cnty.*, 464 U.S. 501, 508 (1984). Thus, the Supreme Court has "provided standards for courts to apply before excluding the public from any stage of a criminal trial." *Presley*, 558 U.S. at 213; *see also Waller*, 467 U.S. at 47 (setting forth *Waller* analysis to be applied when courtroom is closed "over the objections of the accused").

A violation of a defendant's Sixth Amendment right to a public trial is a structural error which, when raised on direct appeal, requires reversal. *Weaver v. Massachusetts*, 582 U.S. 286 (2017). However, not every closure implicates the Sixth Amendment: the "triviality standard" recognizes that "certain errors are not significant enough to rise to the level of a constitutional violation." *United States v. Gupta*, 699 F.3d 682, 688 (2d Cir. 2012) (internal quotation marks omitted). The Second Circuit first fully articulated this standard, explaining it,

> does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer 'prejudice' or 'specific injury.' It is, in other words, very different from a harmless error inquiry. It looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant – whether innocent or guilty – of the protections conferred by the Sixth Amendment.

*Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir. 1996). A closure is trivial – and thus does not violate the Sixth Amendment – where it does not implicate the "values served by the Sixth Amendment," which are "(1) to ensure a fair trial; (2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; (3) to encourage witnesses to come forward; and (4) to discourage perjury." *Id.* at 43 (citing *Waller*, 467 U.S. at 46–47).

This standard has been applied by the majority of circuits to address the issue. *See, e.g.*, *United States v. Anderson*, 881 F.3d 568, 573 (7th Cir. 2018) (applying *Peterson* triviality standard, noting some exclusions "simply do not rise to the level of a violation of the right to public trial."); *United States v. Perry*, 479 F.3d 885, 889–90 (D.C. Cir. 2007) (applying *Peterson* triviality standard and noting, "[a] courtroom closing is 'trivial' if it does not implicate the 'values served by the Sixth Amendment' as set forth in *Waller*." (internal quotation marks omitted)); *United States v. Ivester*, 316 F.3d 955, 959–60 (9th Cir. 2003) (applying the "widely-accepted *Peterson* test"); *United States v. Al-Smadi*, 15 F.3d 153, 154–55 (10th Cir. 1994) ("The denial of a defendant's Sixth Amendment right to a public trial requires some affirmative act by the trial court meant to exclude persons from the courtroom. . . . The brief and inadvertent closing of the courthouse and hence the courtroom, unnoticed by any of the trial participants, did not violate the Sixth Amendment."); *Coiner*, 510 F.2d at 230 (where bailiff "refused to allow persons to enter or leave the courtroom" during "arguments of counsel before the jury," which was "quickly changed by the Court, when advised of the action of the bailiff" was "entirely too trivial to amount to a constitutional deprivation."); *United States v. Greene*, 431 F. App'x 191, 195 (3d Cir. 2011) (noting, "[c]ourts have continued to conduct triviality analyses in the wake of *Presley*'s holding that the Sixth Amendment extends to *voir dire* proceedings."); *United States v. Izac*, 239 F. App'x 1, 4 (4th Cir. 2007) (where defendant's wife – a possible defense witness – was excluded from jury selection, noting, "[w]hile a defendant generally has a Sixth Amendment right to a public trial, in certain situations the exclusion of a member of the public can be too trivial to amount to a violation of the Sixth Amendment.").

2.

Here, the context of the closure described in the affidavit shows that it was too trivial to implicate Dr. Ratnakar's right to a public trial when considering the values served by the Sixth

5

Amendment. First, although the government is certainly not arguing harmless error, there is no allegation that the closure alleged impacted the fairness of Dr. Ratnakar's trial specifically. And, as the Supreme Court recognized in *Weaver v. Massachusetts*, the right to a public trial is structural not because it is of the sort that always results in fundamental error – rather, a public trial error is "structural for a different reason: because of the 'difficulty of assessing the effect of the error.'" 582 U.S. at 298 (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006)). Thus, the Supreme Court recognized in *Weaver* that, "while the public-trial right is important for fundamental reasons, in some cases an unlawful closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint." *Id.* at 299. And Dr. Ratnakar did not allege that the exclusion had any impact on fairness at all. That is not to say that a defendant must demonstrate some specific unfairness in every single case involving a public trial closure – indeed, it would be difficult to argue lack of unfairness if, for example, a defendant's family was excluded from the entirety of the trial or the testimony of a key witness – or that they must allege some harm (as the triviality analysis is distinct from harmless error). Rather, the mere fact of exclusion during voir dire – a few hours in a multi-day trial – without more is insufficient to implicate the Sixth Amendment.

Second, there is no indication that the Court was aware – before, during, or after – of any exclusion of Dr. Ratnakar's family (or any individual generally) from jury selection. Indeed, none of the trial participants were aware at the time. Given that the parties were unaware of any exclusion, the alleged closure simply could not implicate the second protection of the public trial guarantee – indeed, if the government and Court were not aware that Dr. Ratnakar's family was turned away, then it could have no bearing on the government and Court's awareness "of their responsibility to the accused and the importance of their functions." *Peterson*, 85 F.3d at 43.

Third, the exclusion could have no impact on the third or fourth values served by the Sixth

6

Amendment's public trial guarantee – encouraging witnesses to come forward and discouraging perjury – because the exclusion was for a brief portion of a multiple day trial and during a portion of the trial in which no evidence or arguments were presented. There were no witnesses testifying who could be discouraged from perjuring themselves by the presence of the public or the scrutiny of a public trial. Nor is there any basis from which to infer that witnesses were discouraged from coming forward due to the limited exclusion: neither the fact of the trial nor the facts of the case against Dr. Ratnakar were secreted away from the public such as to discourage individuals with information from coming forward.

In sum, this isolated, limited exclusion during a non-evidentiary portion of the trial, which occurred without the knowledge or ratification of the Court or the government, did not implicate the values furthered by the right to a public trial and, therefore, was too trivial to constitute a violation of Dr. Ratnakar's Sixth Amendment right to a public trial. Accordingly, Dr. Ratnakar's Motion for New Trial should be denied on this ground.

### B. The district court correctly precluded irrelevant evidence of Dr. Ratnakar's untimely, post-investigative tax payments.

Dr. Ratnakar argues that the Court must grant a new trial on the grounds that its pre-trial evidentiary ruling on the admissibility of Dr. Ratnakar's post-investigation tax payments was erroneous and, in conjunction with the government's evidence at trial, resulted in prejudice to him. Dr. Ratnakar contends that the evidence – which was excluded after thorough briefing by the parties – was relevant as to his lack of willfulness as to the charged offenses. Finally, Dr. Ratnakar argues that precluding him from presenting evidence of his tax payments after he learned of the investigation "as evidence of willfulness prevented him from receiving a fair trial." [Doc. 115 at 9]. This Court should deny Dr. Ratnakar's motion on any of these theories.

First, the Court's ruling on the pretrial motion in limine was not erroneous. As in his pretrial

7

response to the government's motion in limine [Doc. 61], Dr. Ratnakar contends that the payments he made after he learned of the investigation are relevant to his lack of willfulness, yet this argument ignores temporal relevancy. The question is whether Dr. Ratnakar, at the time he committed the charged offenses, did so willfully. The question is not whether Dr. Ratnakar, months after the charged offenses, after receiving a grand jury subpoena, and after learning of the specific investigation, showed an alleged lack of willfulness. This Court did not err in applying the law and precluding this evidence. Moreover, considering this evidence in the context of the evidence as a whole, even if error occurred it was harmless because substantial evidence supported the jury's verdict. Further, the Court's ruling explicitly did not preclude Dr. Ratnakar's presentation of "his good faith defense and argu[ment] that Accountant Glen Wyland misrepresented defendant's business tax liability[.]" [Doc. 70 at 6].

Dr. Ratnakar contends that the government was permitted to introduce "prejudicial testimony regarding withholdings and refunds." Specifically, he contends that Special Agent Kelly "alluded to the defendant getting a refund" when he had not, and "incorrectly testified that the defendant had not made any deposits for his personal withholdings *as of the date of his testimony*." (emphasis in original) (misplaced parenthesis omitted). This is a misleading summary of SA Kelly's testimony: SA Kelly did not testify or allude to Dr. Ratnakar receiving a tax refund; SA Kelly testified that a tax return was prepared and filed which "request[ed] a refund in the amount of $6,833" and then confirmed that the false withholding figures Dr. Ratnakar claimed helped him get to that refund amount. [Doc. 99 at 115]. To the extent Dr. Ratnakar believed this was inaccurate or misleading testimony, Dr. Ratnakar had – but did not avail himself of – the opportunity to cross-examine SA Kelly regarding whether Dr. Ratnakar received such a refund. [Doc. 100 at 6–41].

Similarly, Dr. Ratnakar contends that SA Kelly "incorrectly testified" regarding withholdings – SA Kelly accurately testified that Dr. Ratnakar had, *as of the relevant time period*,

8

not made federal tax deposits to cover the calculated liability. Dr. Ratnakar may not convert accurate testimony into inaccurate testimony by shifting the temporal goalposts or adding unstated assumptions to testimony. Particularly where, if he believed that the witness was testifying untruthfully or inaccurately, he could have requested permission to approach the bench and either sought a reconsideration of the Court's pretrial ruling regarding late payments based on the trial testimony or argued that the testimony had opened the door to impeachment. Dr. Ratnakar did not do so and cannot rely upon it to render his trial a manifest injustice requiring a new trial.

At base, this group of arguments is simply structurally unsound. Relevancy does not operate under a quid pro quo standard: the government charged Dr. Ratnakar with offenses in violation of the law, each of which contain elements which the government is obligated to prove through relevant, admissible evidence beyond a reasonable doubt.  Dr. Ratnakar's large, late payments – made only after he learned of the criminal investigation and months after he learned of the grand jury investigation – were not relevant to his mental state on the dates charged in the indictment. A defendant is not entitled to introduce irrelevant evidence simply because the evidence against him is prejudicial. *Cf. United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006) (distinguishing between unfair prejudice and prejudice, "as all evidence suggesting guilt is prejudicial to a defendant").

Finally, to the extent Dr. Ratnakar argues that the Court should have allowed this evidence based on the development of evidence at trial, he has forfeited that argument by failing to raise this argument at the time that, in his view, the evidence had developed such as to support admission – while this Court certainly may reconsider its pretrial evidentiary rulings, it is not required to do so sua sponte. *See Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) ("*in limine* rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial"). Moreover, because Dr. Ratnakar did not argue that the Court should allow admission in light of

the development of evidence at trial, he did not properly preserve any issue beyond whether the Court's initial ruling, on the record before it, was erroneous. *See* Fed. R. Evid. 103 advisory committee's note to 2000 amendment ("A definitive advance ruling is reviewed in light of the facts and circumstances before the trial court at the time of the ruling. If the relevant facts and circumstances change materially after the advance ruling has been made, those facts and circumstances cannot be relied upon on appeal unless they have brought to the attention of the trial court by way of a renewed, and timely, objection").

In sum, the Court correctly precluded evidence of Dr. Ratnakar's untimely payments made well after he learned that he was under investigation, and the Court should deny Dr. Ratnakar's attempt to relitigate this issue post-trial and deny his motion for a new trial on this ground.

### C. The jury's verdict is supported by substantial evidence as to each element of each count.

Dr. Ratnakar submits that the interests of justice require a new trial, because "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment, the court should grant a new trial." [Doc. 115 at 2]. As set forth in – and incorporated herein – the Government's Response in Opposition to Defendant's Renewed Motion for Judgment of Acquittal, there was substantial evidence underlying the jury's verdict.

1.

"[A] trial court should exercise its discretion to award a new trial sparingly, and a jury verdict is not to be overturned except in the rare circumstance when the evidence weighs heavily against." *United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006) (quoting *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003)); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018) ("We do not lightly disturb jury verdicts, and even disagreement with the jury's verdict [would] not mandate a new trial.") (internal quotation marks omitted). "Merely believing that the case

could have come out the other way is not enough to warrant a new trial." *United States v. Rafiekian*, 68 F.4th 177, 186 (4th Cir. 2023) ("*Rafiekian II*"). "Rather, this Court has instructed that a new trial based on the weight of the evidence is warranted '[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment.'" *Id.* (quoting *Arrington*, 757 F.2d at 1485). At base, "[t]he ultimate test of whether a new trial is warranted is whether letting a guilty verdict stand would be a manifest injustice." *Id.* at 190 (internal quotation marks omitted).

2.

Dr. Ratnakar contends, first, that because the government argued in closing that the obstruction of justice count (Count Forty-Two) was the "heart of the case," the jury's return of a verdict of not guilty as to Count Forty-Two means the jury "found that the Government's evidence as to Count 42 was insufficient" and, therefore, "the Government cannot rely upon such evidence to prove the charges contain [sic] in Counts 1 through 41 of the indictment because there is insufficient evidence to establish the essential element of willfulness on the part of Dr. Ratnakar." [Doc. 115 at 34]. This strained tautology cannot withstand scrutiny, particularly when considered in light of the instructions given to the jury in this case.

Courts are clear that we presume, absent a reason to doubt, that the jury acts as instructed: "[S]ave for *extraordinary* situations, we adhere to the crucial assumption . . . that jurors carefully follow instructions." *United States v. Rafiekian*, 991 F.3d 529, 550 (4th Cir. 2021) ("*Rafiekian I*") (internal quotation marks omitted) (emphasis in original). This is the case unless the record reflects a "specific reason to doubt that the jury followed the directions it was given." *Id.* (cleaned up).

Here, the jury was instructed, first, that it was their duty to "determine from the evidence what the facts of this case are" and to "apply the rules of law . . . to those facts in order to determine whether" the defendant is guilty of the offenses charged in the Indictment. [Doc. 91 at 1]. The jury was instructed that, "[t]he evidence in this case consists of the sworn testimony of all witnesses,

11

regardless of who may have called them; all exhibits received in evidence, regardless of who may have produced them; and all facts that were admitted." *Id.* at 3. The jury was further instructed that "[q]uestions, statements, and arguments of counsel are not evidence in this case." *Id.*

Absent an indication on the record, we presume that the jury followed the instructions given to it and understood that it was their job to discern the facts from the evidence (which expressly does not include arguments of counsel, even as to what count is at the heart of the government's theory) and apply them to the law to reach a verdict. There is no basis on the record to conclude that the jury necessarily rejected all of the evidence that the government argued supported Count Forty-Two simply because the jury returned a verdict of not guilty as to that count. Indeed, the jury could have decided that the evidence as to all of the elements or any one element was lacking or rendered a verdict of not guilty for some other speculative reason.

3.

Next, Dr. Ratnakar argues that the jury's verdict shows that it "implemented a form of 'strict liability' in its verdict as to Counts 1 through 41." [Doc. 115]. The Government respectfully submits that not only is this argument meritless but improperly speculative and, therefore, not a valid basis upon which to seek a new trial.

"[I]t has been long settled that inconsistent jury verdicts do not call into question the validity or legitimacy of the resulting guilty verdicts." *United States v. Davis*, 801 F. App'x 75, 78–79 (4th Cir. 2020) (internal quotation marks omitted). Thus, "[a] defendant cannot challenge his conviction merely because it is inconsistent with a jury's verdict of acquittal on another count." *United States v. Legins*, 34 F.4th 304, 316 (4th Cir. 2022) (quoting *United States v. Thomas*, 900 F.2d 37, 40 (4th Cir. 1990)). And logically so – "an inconsistent verdict can result from mistake, compromise, or lenity," *United States v. Louthian*, 756 F.3d 295, 305 (4th Cir. 2014), and because the court cannot inquire into deliberations, it is left with only rank speculation as to the basis for

such a verdict. *See Legins*, 34 F.4th at 316.

To the extent Dr. Ratnakar argues that the jury's verdict is inconsistent – a characterization which the government would dispute – this is not an appropriate ground for a new trial. Nor can we assume that, based on the defendant's weighing of some of the evidence and the jury's verdict, that the jury must have used an inappropriate, inapplicable mental state upon which it was not instructed. As noted above, we presume that jurors follow instructions absent a basis in the record. *See Rafiekian I*, 991 F.3d at 550 (we assume "that jurors carefully follow instructions"). Here, the jury was instructed carefully as to the mental state applicable to the offenses: the jury was repeatedly instructed that Dr. Ratnakar must have committed the tax offenses willfully, and that "willfully" was "the voluntary intentional violation of a known legal duty." [Doc. 91 at 18]. The jury was expressly instructed that "[a] defendant's conduct is not willful if it was due to negligence, inadvertence, or mistake, or was the result of a good faith misunderstanding of the requirements of the law." *Id.* The jury was expressly instructed, repeatedly, that the government must prove, beyond a reasonable doubt, that the defendant's actions were willful – absent an actual indication in the record (rather than a mere disagreement with the weight of the evidence or selective parsing thereof), we presume that the jury followed these instructions, which necessarily eliminates any possibility that the jury applied "strict liability."

4.

Finally, many of Dr. Ratnakar's arguments stem from the inconsistency inherent in his own theory of defense: his argument at trial turned on a dichotomic characterization of his former accountant Glen Wyland, as both a competent return preparer upon whom Dr. Ratnakar reasonably relied and a negligent witness lying to cover up his own criminal ineptitude whose testimony the jury should not credit. Dr. Ratnakar contends that Glen Wyland's "uncontradicted testimony established that Dr. Ratnakar did not have the requisite intent and willfulness to be found guilty of

13

these charges," yet argued to the jury that large parts of Wyland's testimony could be tossed in the trash. [Doc. 108 at 47, ("So Wyland is saying that the Doctor told him to backdate it on June 23rd. What craziness is this? . . . That's because it's made up. And when you make up stuff, it's hard to keep track of what's going on. It's made up."), 48 ("Glen Wyland said, if you believe him"), 48–49 ("I talked to Glen Wyland, and I said, ' Hey, you've managed to get yourself immunity three times. So I guess whatever you had intended, it ended up working.")]. Dr. Ratnakar can hardly now fault the jury for accepting part of his invitation and simply disregarding the testimony of Glen Wyland.

### IV. Conclusion

In sum, all three of the asserted grounds for a new trial must fail because Dr. Ratnakar fails to establish any injustice that would justify the grant of a new trial.

Respectfully submitted,

RANDOLPH J. BERNARD
ACTING UNITED STATES ATTORNEY

By:
/s/ Eleanor F. Hurney
Eleanor F. Hurney
Assistant U.S. Attorney

and

/s/ Jarod J. Douglas
Jarod J. Douglas
Assistant U. S. Attorney

## CERTIFICATE OF SERVICE

I, Eleanor F. Hurney, Assistant United States Attorney for the Northern District of West Virginia, hereby certify that on February 5, 2025, the foregoing *United States' Response in Opposition to Defendant's Motion for New Trial* was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

                RANDOLPH J. BERNARD
                ACTING UNITED STATES ATTORNEY

By:   /s/ Eleanor F. Hurney
        Eleanor F. Hurney
        Assistant United States Attorney